USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/20/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK A. PERELMAN,

                                    Plaintiff,

                    -against-


VISA USA, INC.,

                                    Defendants.

---

24-CV-9793 (AT) (KHP)

**REPORT AND RECOMMENDATION
ON
MOTION TO DISMISS**

**TO: HONORABLE ANALISA TORRES, United States District Judge**
**FROM: KATHARINE H. PARKER, United States Magistrate Judge.**

Plaintiff Mark A. Perelman ("Plaintiff" or "Perelman), proceeding *pro se*, brings this action against Visa USA Inc. ("Visa" or "Defendant") alleging it discriminated against him on the basis of race, national origin, religion, sex, sexual orientation and disability when it failed to hire him (or even interview him) for sixteen different jobs in violation of Title VII of the 1964 Civil Rights Act, the Americans with Disabilities Act ("ADA"), and the New York State and City Human Rights Laws ("NYSHRL" and "NYCHRL").[1]  He asserts various theories of liability including disparate treatment, disparate impact, and hostile work environment.  He also asserts that Defendant retaliated against him after he filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") by black-listing him from obtaining any jobs at Visa. Finally, he asserts he and his start-up businesses, Charm and Capitao, were wrongfully excluded from certain new business funding programs offered by Defendant in violation of 42 U.S.C. § 1981

---

[1] Though Plaintiff does not formally assert a claim under the NYCHRL alongside his other causes of action, he does seek relief under the NYCHRL insofar as he references it on page 4 of the FAC. Therefore, the complaint can be liberally construed to assert a claim under the NYCHRL.

because such programs were limited to women and minority-owned businesses.  He seeks $600,000.00 in lost earnings, $8,900,000.00 in lost potential future earnings, $179,000.00 for "accumulated debt and penalties," $200,000.00 for emotional distress, and $1,000,000.00 in punitive damages.  Before the Court for a Report and Recommendation is Defendant's motion to dismiss Plaintiff's first amended complaint ("FAC") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6) and motion to strike pursuant to Rule 12(f).  (ECF No. 32)  For the reasons stated below, I respectfully recommend that Defendant's motions be GRANTED in part and DENIED in part.

BACKGROUND[2]

### 1.  The Parties

Perelman, who self-identifies as a disabled, White, "gay, Jewish male with an Eastern European descent," is a licensed Chartered Financial Analyst ("CFA") with over twelve years of professional experience in finance and technology.  (FAC, at III.A; ¶¶ 7, 65, 231, 244)  He is based in New York.  (*Id.*, at ¶ 5)

Visa is an American multinational payment technology company that facilitates electronic funds transfers throughout the world.  (*Id.*, at ¶ 6)  It is incorporated in Delaware and headquartered in San Francisco.  (*Id.*)

---

[2] The facts are drawn principally from the FAC at ECF No. 29.  The Court must accept as true all non-conclusory factual allegations in the FAC, drawing all reasonable inferences in Plaintiff's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  When evaluating a Rule 12(b)(6) motion for failure to state a claim, a district court is permitted to review not only the allegations set out in the complaint itself, but also any exhibits appended to the pleading or materials that the complaint explicitly incorporates by reference.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  The same principle applies to a facial challenge under Rule 12(b)(1)—that is, a jurisdictional motion that relies exclusively on the complaint's allegations and any documents attached to or referenced therein.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016).  Accordingly, courts may examine materials incorporated by reference when resolving such motions.  *See Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 n.3 (S.D.N.Y. 2009) (Chin, J.).

### 2. Plaintiff's Application History at Visa

Between 2021-2024, Plaintiff applied to at least sixteen different roles at Visa through its online job portal.  (*Id.,* at IV.B, ¶¶ 5, 20)  Plaintiff claims that despite being qualified for the positions and having professional credentials comparable to others who applied for and received the positions, he was never able to secure an interview or progress through the hiring process.  (*Id.*)  Indeed, it appears that all his applications were rejected outright without Plaintiff ever speaking to a person at Visa about his applications.  The positions he applied for were: (1) VP, Head of Design, Visa Innovation; (2) VP, Fintech Partnerships, LAC; (3) Senior Director, Strategy and Monetization; (4) VP, Global Insights; (5) Director, Digital Currency Policy Lead; (6) Senior VP, Insights & Innovation; (7) Senior Design Researcher; (8) NA Digital Partnership - Director, Fintech Partnerships; (9) VP, Digital Partnerships; (10) Design Strategy Director; (11) Senior Director, Head of VGS Sales, Latin America & the Caribbean; (12) Senior Manager, Digital Products Client Solutions; (13) Director, Ecosystem Risk Advisory, Cryptocurrency; (14) Director, Global Strategic Digital Partnerships, Big Tech Segment; (15) Director, Product – North America Innovation & Design; and (16) Director, Future of Payments. (*Id.,* at ¶ 110)

The FAC alleges that Defendant provided him the following reasons for rejecting his job applications:  (a) for roles (1)-(3), Defendant classified him as "unqualified;"[3] (b) for roles (4)-(12), Defendant classified him as "less qualified" than the successful candidate; (c) for roles (13)-(15), Defendant classified the positions as "cancelled/no one hired;" and (d) for role (16), Defendant indicated that Plaintiff's application was submitted too "late" to be considered.  (*Id.*)

---

[3] The FAC alleges that Plaintiff was told he was unqualified for these positions because he failed to meet geographic residency requirements (FAC, at ¶ 135) and/or language proficiency requirements (FAC, at ¶ 119).

Save for role (15), Plaintiff does not allege when specifically he applied for the above positions, nor when Defendant rejected his applications.

Plaintiff inserted the following chart and factual allegations into the FAC (combined below by this Court into a single chart for convenience) (FAC, at ¶¶ 74 n.26, 170-80) wherein he describes, based on LinkedIn searches he conducted, who he believes was hired for each of the sixteen positions and speculates about some of the alleged successful candidates' race, religion, gender, and sexual orientation:

| Position | Hired | Demographics |
| --- | --- | --- |
| (1) VP, Head of Design, Visa Innovation | Mischa Lumiere | Straight, White, Christian female |
| (2) VP, Fintech Partnerships, LAC | Rodrigo Barros de Paula | Straight, Hispanic, Christian male |
| (3) Senior Director, Strategy and Monetization | David Paxton | Straight, White, Christian male |
| (4) VP, Global Insights | Katherine Norwood | Straight, White, Christian female |
| (5) Director, Digital Currency Policy Lead | Ezechiel Copic | Straight, White, Christian male |
| (6) Senior VP, Insights & Innovation | Valla Vakili | Straight, White, Muslim male |
| (7) Sr. Design Researcher | Unidentified | Unidentified |
| (8) NA Digital Partnerships – Director, Fintech | Unidentified | Female |
| (9) VP, Digital Partnerships | Unidentified | Unidentified |
| (10) Design Strategy Director | Zach Stout | Straight, White, Christian male |
| (11) Sr Director, Head of VGS Sales, LAC | Juan Cogorno | Straight, Hispanic, Christian male |
| (12) Sr Manager, Digital Products Client Solutions | Unidentified | Straight, Asian male |
| (13) Director, Ecosystem Risk Advisory, Cryptocurrency.[4] | Unidentified | Unidentified |
| (14) Director, Global Strategic Digital Partnerships, Big Tech Segment | Unidentified | Unidentified |
| (15) Director, Product – North America Innovation & Design | Erin Fu | Unidentified |
| (16) Director, Future of Payments | Unidentified | Unidentified |

The FAC also includes charts and factual allegations (combined below by this Court into a single chart for convenience) (FAC, at ¶¶ 112, 140) setting forth certain information Plaintiff apparently gathered from LinkedIn about some of the alleged successful candidates'

---

[4] Note that positions (13) – (16) are not included in Plaintiff's chart, however, for efficiency purposes, the Court has completed the chart based on representations made by Plaintiff in other portions of the complaint.

backgrounds and information about his own qualifications for twelve of the positions compared

to the candidates he believes were chosen for the positions:

| Job Title | Hired Candidate | Plaintiff's Qualifications |
|---|---|---|
| (1) VP, Head of Design, Visa Innovation | Background in wine sales and marketing at AmEx, advanced rapidly at Visa despite limited 'corporate payments' experience | MBA & MMS (Systemic Risk & Regulation), design and innovation education and experience at Yale, leadership at Capitao and Charm, and advisory roles at IBM. Led global teams as Clinton Foundation and other organizations. |
| (2) VP, Fintech Partnerships, LAC | Sales and product manager, primarily within Brazil. Previously focused on transactional sales rather than partnerships. His experience in regulatory risk is limited. | Extensive experience in forming strategic partnerships across multiple regions, working with companies like Visa, IBM, BASF, and Bharti Airtel. He demonstrated regulatory insight by preventing IBM from investing in Facebook's Libra, avoiding financial and compliance risks. At Yale, he founded the FinTech Club, fostering partnerships with fintech firms and academic institutions, showcasing leadership and innovation in uniting cross-sector stakeholders |
| (3) Senior Director, Strategy and Monetization | Does not meet the basic minimum education and relevant experience requirement. Experience is largely confined to strategy consulting and corporate strategy with limited direct leadership of integrated product, sales, and marketing teams. | At PineBridge, he led R&D, technology, and marketing initiatives for quant trading, coordinating with departments including sales, legal, and engineering. At the Clinton Foundation, he managed multi-country finance and investment projects, partnered with fintech firms, and led budget planning across functional areas. At Yale, he founded the FinTech Club, organized events, and collaborated with internal and external organizations, while at Capitao/Charm, he managed the Charm App's development. Plaintiff also has deep experience with business intelligence tools beyond Tableau; at Bates White and PineBridge, he utilized Bloomberg, ThomsonOne, and BARRA, while at Yale he taught fraud identification using Bloomberg and DataStream. |
| (4) VP, Global Insights | PhD in Feminist Literature, DEI storytelling experience, unregulated cloud researcher | Over 12 years in finance and technology; founder of Capitao, Charm with fintech expertise; trained research teams at Yale under Jim Chanos; focused on fraud detection in securities markets; advised IBM Blockchain on cryptocurrency; lobbied against joining Facebook's Libra; experienced in economic litigation consulting; MMS in Systemic Risk & Regulation for understanding regulated payments. |
| (5) Director, Digital Currency Policy Lead | Currency strategist, no payments industry experience | Founded payments company Charm, invested in fintech through the Clinton Foundation, and has extensive education in payments theory; worked at Amazon and IBM, authored key sections for reports on retail central bank digital currencies, and influenced strategic decisions, including opposing Facebook's Libra; effectively navigates the fintech landscape despite Visa's dismissal of his IBM tenure. |

| | | |
|---|---|---|
| (6) Senior VP, Insights & Innovation | PhD in Asian and Middle Eastern\studies; unrealistically claims full credit for building Citi's global innovation center; While maximizing user engagement and monetization, his approach contributed to Citi's withdrawal from the space. | Worked at Bates White on payments-related consulting, served as a quant and portfolio manager at PineBridge, and led finance initiatives at the Clinton Foundation in Africa, managing budgets over $5 million. Founded Capitao, developed the Fintech Charm, and secured $250,000 in financing; expertise in financial literacy, regulatory compliance, and strategic partnerships. Co-Founded the FinTech Club at Yale, organized events, and consulted as a Blavatnik Fellow, showcasing his ability to lead and innovate in the fintech space. |
| (7) Sr. Design Researcher | Unknown. | See above. |
| (8) NA Digital Partnerships – Director, Fintech | Product launches with competitors and Visa with limited understanding and relationship building of technical products. Others hired for partnerships roles based on sales experience outside of payments | See above. More than just spending other people's money for self-promotion, he applied his knowledge at IBM Blockchain to argue against senior executives and convinced IBM to not back Facebook's Libra investment. |
| (9) VP, Digital Partnerships | See above. | See above. |
| (10) Design Strategy Director | Product manager focused on SCRUM/Agile with a 1-month design certificate | MBA & MMS (Systemic Risk & Regulation), design and innovation education and experience at Yale, leadership at Capitao, Charm, and advisory at IBM |
| (11) Sr Director, Head of VGS Sales, LAC | Politically connected with limited policy, payments, and corporate management experience; he graduated from Yale SOM's MAM program, a lower standard program than Plaintiff's full-time MBA. | Plaintiff holds a full-time MBA and an MMS focused on payment and policy issues essential for the role; he has experience with government clients as an economic litigation consultant and director at the Clinton Foundation. |

| (12) Sr Manager, Digital Products Client Solutions | Two engineering degrees and experience in e-commerce, lacking evidence of payments knowledge or soft skills for client communication. | Robust background in economic litigation consulting and equity research, where he effectively communicated complex technical concepts; he has worked with Amazon and IBM's WorldWire team and has developed software requirement specifications for Charm, demonstrating a strong grasp of fintech trends, operations, and regulation. |
|---|---|---|

Plaintiff, however, does not provide that actual minimum job qualifications for any of the sixteen positions or provide factual information about why he met the minimum job qualifications.  He simply attempts to compare his experience and education to the experience and education he found on the supposedly successful candidates' LinkedIn profiles.

Plaintiff alleges that although his application and resume did not explicitly mention his race, religion, national origin, sexual orientation, HIV status, or sex, that the unnamed decisionmakers knew at the very least that he is a White, Jewish male with an Eastern-European background based on his first and last-name, review of his social media accounts (which he speculates were reviewed), and resume, which included the universities he attended (Yale and Colgate).  (FAC, at ¶¶ 100 n.38, 101)  He then suggests that because in his view he was a competitive candidate for all the jobs to which he applied,  his intersectional characteristics fell outside of the demographic groups promoted by Visa's DEI initiatives and speculates that his characteristics must have been the reason his applications were rejected. (FAC, at IV.B., ¶¶ 105, 113)

Plaintiff also complains that because he is a White man, he was unable to apply to "She's Next," a Visa-sponsored competition for start-up companies because it included explicit eligibility criteria based on gender.  (*Id.*, at ¶ 39)  Thus, he was unable to obtain support for his start-up companies through this program.  In July 2020, Plaintiff received an email from a third-party describing another Visa program called "IFundWomen," which was described as

supporting "[b]lack women-owned small businesses." Plaintiff complains he (and his start-ups) were excluded from this program based on his race and gender.  (*Id.*, at ¶¶ 38-39)  The only startup contest that Visa hosted for which Plaintiff purportedly qualified was the "Visa Everywhere Initiative" ("VEI").  (*Id.*, at ¶ 56)  In that competition, applicants competed under "neutral technical criteria" and the finalists of that competition, while containing some heterosexual, Christian, White males, also included individuals of other ethnic, religious, racial, and sexual groups.  (*Id.*)  However, Plaintiff has not alleged that he applied for and competed in the VEI.

### 3.  Defendant's DEI Initiatives

The FAC alleges that Visa implemented a series of diversity, equity, and inclusion ("DEI") initiatives that sought to increase representation of certain demographic groups within the company during the period Plaintiff applied but was rejected for employment.  (*Id.*, at ¶ 45) Plaintiff suggests that the DEI programs were discriminatory and the reason all his job applications were rejected.  The FAC alleges that Visa announced goals to increase the number of "underrepresented" vice-president-level employees by 50% within three years and to increase overall representation of underrepresented groups by 50% within five years, with particular focus on Black/African American and Hispanic/Latinx employees.  (*Id.*, at ¶ 47)  These initiatives included establishing a dedicated recruitment team and events for Black candidates, mandating that interview slates contain diverse candidates, and incorporating information about progress toward increases in "diversity" into quarterly business reviews.  (*Id.*, at ¶¶ 47, 48)  The company also expanded community-based partnerships and opened new offices in locations believed to offer access to diverse talent pools, such as Atlanta.  (*Id.*, at ¶ 58)

Visa's DEI strategy also allegedly included internal programming, such as "Race Talks," allyship workshops, and manager training intended to support a more inclusive work environment. (*Id.*, at ¶ 52) The FAC states that Visa's public reports focus primarily on race and gender metrics, but concedes Visa has not disclosed the content or evaluative outcomes of its DEI training. It also asserts that Visa has not conducted audits of its DEI programs. (*Id.*, at ¶ 55) Finally, Visa is alleged to have tied elements of its DEI objectives to philanthropic activity, corporate-responsibility programs, and external partnerships and directed its external efforts to supporting minority-owned businesses. (*Id.*, at ¶ 56)

The FAC states that while Visa's DEI initiatives were in place, its workforce demographics shifted. For example, White representation declined from 40% in 2020 to 35% in 2023, and White male representation declined from 23% to under 20% in that period. (*Id.*, at ¶ 9)

### 4. Plaintiff's EEOC Charge and Notice of Right to Sue

On March 13, 2024, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") claiming Visa discriminated against him when it did not hire him for any of the jobs he applied to and by excluding his startup companies, Capitao and Charm, from Visa startup competitions. (FAC, at V; ECF No. 34-2). His charge cites discrimination based on race, sex, and religion. Although not explicit in the FAC, it appears that Visa filed a position statement in response to the charge, which Plaintiff responded to on August 19, 2024, when he filed a rebuttal letter supplementing his Charge by "explicitly identifying sexual orientation and disability as additional bases for his claims." (FAC, at ¶ 21 n. 2) On September 19, 2024, the EEOC provided Plaintiff with a notice of right to sue.

9

**5. Present Claims**

Plaintiff asserts seven causes of action.  Count I alleges disparate treatment discrimination under Title VII in connection with Visa repeatedly rejecting Plaintiff for positions at the company on the basis of his race (Caucasian), religion (Jewish), sexual orientation (Gay), sex (Male), and national origin (Eastern European).  (FAC, at ¶ 212)  Count II asserts that Visa similarly discriminated against him on the basis of disability insofar as he is a person living with HIV, in violation of the ADA.  In connection with this claim, he asserts generally that Visa's hiring algorithms and DEI practices excluded disabled candidates and failed to use disability-inclusive evaluation criteria.  (*Id.*, at ¶ 213)  He does not provide any specific detail about these algorithms or evaluation criteria.  Count III alleges retaliation in violation of Title VII on the ground that after Plaintiff filed his EEOC Charge and lawsuit, a Visa litigation executive informed him he had been placed on a "do-not-hire" list. (*Id.*, at ¶ 214)  Count IV contends that Visa's refusal to hire Plaintiff, and the alleged exclusion of his startup companies from Visa sponsored entrepreneurship programs, interfered with his contractual rights under the Visa Developer Platform API Terms and his Visa cardmember agreement, in violation of 42 U.S.C. 1981.  (*Id.*, at ¶ 215)  Count V claims that Visa violated Title VII by creating a hostile work environment for job applicants through allegedly discriminatory hiring patterns, DEI messaging he characterizes as antisemitic or otherwise exclusionary, and repeated rejection of him for jobs without fair consideration.  (*Id.*, at ¶ 216)  Count VI arises under the New York State Human Rights Law and the New York City Human Rights Law and mirrors Plaintiff's Title VII discrimination and retaliation claims.  (*Id.*, at ¶ 217)  Finally, Count VII alleges that Visa's DEI policies broadly produce adverse effects on applicants sharing his intersectional characteristics, thus

constituting disparate impact against White, male, Jewish, disabled, and LGBT applicants in violation of Title VII.  (*Id.*, at ¶ 218)

## LEGAL STANDARD

### 1.  Rule 12(b)(1)

A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Because "Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" "an actual controversy must be extant at all stages of review." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (citation omitted).

"A district court must dismiss a complaint for lack of subject matter jurisdiction, under Rule 12(b)(1) . . . if a plaintiff fails to establish standing to bring the action*." Dominguez v. Athleta LLC*, No. 19 Civ. 10168 (GBD), 2021 WL 918314, at *2 (S.D.N.Y. Mar. 10, 2021) (citing *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416-17 (2d Cir. 2015)).  In resolving a motion to dismiss under Rule 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation omitted), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *see also Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  "A Rule 12(b)(1) motion challenging subject matter jurisdiction may be based solely on the complaint or may rely on evidence beyond the pleadings." *Paguda v.*

*Yieldstreet*, No. 20 Civ. 9254 (LGS), 2021 WL 4896278, at *2 (S.D.N.Y. Oct. 20, 2021) (internal

citations omitted).

## 2. Rule 12(b)(6)

Under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that

is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will be

facially plausible only "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 663 (2009).  A complaint is properly dismissed, where, as a matter of law,

"the allegations in a complaint, however true, could not raise a claim of entitlement to relief."

*Twombly*, 550 U.S. at 558.  Indeed, a district court must accept as true all well-pleaded factual

allegations in the complaint and draw all inferences in the plaintiff's favor.  *ATSI Commc'ns, Inc.*

*v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  However, that principle does not apply "if

[the complaint] tenders 'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556

U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Courts are also "ordinarily obligated to afford special solicitude to *pro se* litigants." *Tracy*

*v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).  This concept protects the rights of *pro se*

litigants who are "likely to forfeit important rights through inadvertence if he is not afforded

some degree of protection" due to a lack of "legal training and experience." *Id.*  Special

solicitude can come in different forms, but most often takes the form "of liberally construing

pleadings, moving papers, and appellate briefs." *Id*.; *see also  Holmes v. Goldin*, 615 F.2d 83, 85

(2d Cir. 1980); *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001); *Ruotolo v. IRS*,

28 F.3d 6, 8 (2d Cir. 1994); *Ortiz v. Local 32BJ*, No. 07 Civ. 8030 (LTS) (KNF) 2008 WL 2604810, at

*3 (S.D.N.Y. June 25, 2008) ("The pleadings drafted by a pro se litigant . . . are held to a less stringent standard than those prepared by attorneys, and are to be construed liberally to raise the strongest arguments they suggest.")

## DISCUSSION

### 1.      Federal Sexual Orientation and Disability Discrimination Claims

Defendant argues that Plaintiff failed to exhaust his administrative remedies with respect to his federal sexual orientation and disability discrimination claims because he failed to raise sexual orientation and disability discrimination in his EEOC charge.  It also argues that because neither of these alleged forms of discrimination were raised with the EEOC within 300 days of the alleged adverse employment actions (*i.e.*, the decisions not to hire Plaintiff), the federal claims are now time-barred.

Administrative exhaustion serves "to avoid unnecessary judicial action by the federal courts by '[giving] the administrative agency the opportunity to investigate, mediate, and take remedial action.'" *Sackett v. Dirlam*, No. 22 Civ. 6245, 2023 WL 4206520, at *4 (W.D.N.Y. June 26, 2023) (alteration in original) (quoting *Stewart v. U.S. I.N.S.*, 762 F.2d 193, 198 (2d Cir. 1985)).  Before initiating a Title VII or ADA employment discrimination lawsuit, a plaintiff is required to exhaust available administrative remedies by filing a charge of discrimination with the EEOC no later than 300 days after the alleged discriminatory conduct or otherwise unlawful employment practice occurred.[5]  *Wade v. NYC DOE*, 667 F. App'x 311, 312 (2d Cir. 2016) (summary order); *Gomez v. N.Y.C. Police Dep't*, 191 F.Supp.3d 293, 299 (S.D.N.Y. 2016).  Failure

---

[5] The 300-day limitation period applies in states, including New York, where there is a state or local fair employment practices agency equivalent to the EEOC.  42 U.S.C.§ 706(b) (e)(1).

13

to exhaust administrative remedies is an affirmative defense. *Hardaway v. Hartford Public Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018).

In deciding whether a plaintiff has stated a claim under Title VII or the ADA, the Court will "consider only those acts that occurred within 300 days of [the EEOC charge] and were thereby properly exhausted." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018); *accord Floyd v. Southern Westchester BOCES*, No. 14 CV 5842 (VB), 2015 WL 5459992, at *5 (S.D.N.Y. July 31, 2015) (declining to consider unexhausted allegations). Put differently, the 300-day requirement is akin to a statute of limitations. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996)). If the EEOC is not going to prosecute a matter itself, it will issue a notice of right to sue to the charging party. Once the plaintiff receives a right-to-sue notice from the EEOC, he has 90 days to commence a court action. 42 U.S.C. § 2000e-5(f)(1); 42 U.S.C. § 12117(a).

In the Second Circuit, "[a] district court may only hear claims that are either included in the EEOC charge or are based on conduct which is reasonably related to conduct alleged in the EEOC charge." *Fiscina v. N.Y.C. Dist. Council of Carpenters*, 401 F.Supp.2d 345, 356 (S.D.N.Y. 2005) (citation and internal alterations omitted); *Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 614 (2d Cir. 1999) (setting out reasonably related test first articulated in *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)). Explained differently, claims that were not expressly presented to the EEOC may nonetheless be pursued in a later court action if they are sufficiently connected to the allegations included in the administrative charge – specifically, when the challenged conduct is within the scope of the EEOC investigation that could reasonably be expected to flow from that charge. *See Espinoza v.*

14

*Port Auth. of NY & NJ*, No. 19 Civ. 258 (AT), 2022 WL 623809, at *6 (S.D.N.Y. Mar. 2, 2022)

(citing *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003)) (internal quotation marks omitted);

*Williams* v. *N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir.2006); *Fitzgerald v. Henderson*, 251 F.3d

345, 359-60 (2d Cir.2001)).  Conduct is reasonably related to conduct in an EEOC charge if: "[1]

the claim would fall within the reasonably expected scope of an EEOC investigation of the

charges of discrimination; [2] it alleges retaliation for filing the EEOC charge; or [3] the plaintiff

alleges further incidents of discrimination carried out in precisely the same manner alleged in

the EEOC charge."  *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (alterations in original)

(citation and quotation marks omitted).  This exception to the exhaustion requirement is

essentially an "allowance of loose pleading and is based on the recognition that EEOC charges

frequently are filled out by employees without the benefit of counsel and that their primary

purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering." *Deravin*

*v. Kerik*, 335 F.3d 195, 201 (2d Cir.2003) (internal quotation marks omitted).  Thus, the central

question courts should ask when evaluating whether a claim is reasonably related to conduct in

an EEOC charge is whether the charge gave the EEOC adequate notice to investigate

discrimination on both the named and unnamed bases.  See *Williams*, 458 F.3d at 70. [6]

Plaintiff's EEOC charge does not explicitly allege discrimination based on sexual

orientation or disability; rather, it mentions discrimination based on "race, religion, [and] sex."

---

[6] The Court notes that Plaintiff filed his EEOC charge on March 13, 2024.  Thus, any jobs Plaintiff applied for and was denied before May 18, 2023 fall outside of the 300 day-period and are time-barred under Title VII and the ADA.  Plaintiff does not specify the exact dates on which he applied for the various jobs at Visa or the dates he learned his application had been denied – only that he applied for various jobs between 2021 and 2024 and was not hired for any of them.  Therefore, it is unclear which job applications and rejection decisions are timely under federal law, although it appears that many (if not all) are timely under state and local law.  A three-year statute of limitations applies to claims under the NYSHRL and NYCHRL.  *See Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (applying three-year statute of limitations to claims under the NYSHRL); N.Y. C.P.L.R. §

(emphasis added).  Plaintiff argues that sexual orientation discrimination is a form of sex

discrimination such that it was sufficiently alleged in his EEOC complaint and is administratively

exhausted., relying on *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020), which held that

sexual orientation discrimination is discrimination "because of" sex and a form of sex

discrimination covered by Title VII.  *See also Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 113-14

(2d Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty.*, 590 U.S. 644, 649 (2020) (holding that

"[s]ex plays a necessary and indistinguishable role in an adverse employment action based on

sexual orientation or gender identity and is thus prohibited under Title VII).  Critical to the

court's rationale in finding the plaintiffs could raise claims under Title VII was the Court's

reading of the statutory text, which prohibits employers from taking certain actions "because

of" sex, the traditional standard of but-for causation.  The Court interpreted this language to

mean that "so long as the plaintiff's sex was one but-for cause of the employment decision,

Title VII" was triggered.  *Id*. at 656.  Also critical to the Court's analysis was Title VII's focus on

treatment of individuals as opposed to groups.  That is, if, for example, an employer fires a gay

man for being insufficiently masculine based on a sex stereotype of what masculinity is, then

the employer has discriminated against the individual because of that individual's sex.  *Id.,* at

659.  In other words, "it is impossible to discriminate against a person for being homosexual or

transgender without discriminating against that individual based on sex."  *Id*. at 660.  However,

the converse is not necessarily true.  That is, it is possible to discriminate against a person based

---

214(2) (McKinney 2021); N.Y.C. Admin. Code § 8–502(d).  Many courts in this Circuit have held the filing of an EEOC charge tolls the statute of limitations for these claims until the notice of right to sue is issued.  *See Shojae v Harlem Hospital*, 2020 WL 1862293 (S.D.N.Y. Apr. 14, 2020) (discussing rationale for tolling), *aff'd* 764 F. App'x 113, 114 n.2 (2d Cir. 2019).  Therefore, claims relating to adverse hiring decisions post-dating June 11, 2021 (3 years + 190 days) are timely under the NYSHRL and NYCHRL.

on sex without discriminating on the basis of sexual orientation. For example, favoring a gay man over a gay woman for a job would be sex discrimination but not sexual orientation discrimination.  The Court recognized that sexual orientation discrimination often involves sex stereotyping, a variation or subcategory of sex discrimination just as is "sex-plus" discrimination.  Sex-plus discrimination means that not all members of the class are treated adversely, but rather a subgroup of the protected class is treated adversely (*e.g.*, gay men, not all men; women with school-age children, not all women).  Thus, Plaintiff's theory of sexual orientation discrimination requires a showing that being a gay male was the basis of the disparate treatment, as opposed to simply being a male.  But, his EEOC charge is devoid of any information from which such a theory could be inferred as it does not mention his sexual orientation at all.

Moreover, *Bostock* only gets the Plaintiff so far, because the applicable legal standard at issue here is not whether sexual orientation discrimination is encompassed by Title VII (the question addressed in *Bostock*), but whether Plaintiff's claim of sexual orientation discrimination – a subtype of sex discrimination -- can be deemed "reasonably related to conduct alleged in the EEOC charge" for purposes of assessing whether it was properly exhausted. *Shah*, 168 F.3d at 614.  In the right case, a claim of sex discrimination with facts suggesting that the plaintiff is proceeding on a theory of sexual orientation discrimination, could be sufficient to put the EEOC on notice of the claim under the applicable Second Circuit standard.   But that is not the case here.

In *Hamilton v. Siemens Healthcare Diagnostics, Inc.*, No. 23 Civ. 7408 (KMK), 2025 WL 863572 (S.D.N.Y. Mar. 18, 2025), a court in this District dealt with this precise issue.  The

17

plaintiff in that case claimed sex discrimination in his EEOC charge but failed to mention sexual

orientation discrimination.  *Id.*, at *6.  The Court found that sexual orientation discrimination

cannot necessarily be inferred by a claim of sex discrimination in an EEOC charge for purposes

of putting the EEOC (and defendant) on notice of the claim and held that the plaintiff had not

exhausted a claim of sexual orientation discrimination.  *Id.*  The Court reasoned, consistent with

*Bostock,* that while an employer necessarily discriminates on the basis of sex when

discriminating on the basis of sexual orientation, it is not always the case that discrimination on

the basis of sex is discrimination based on sexual orientation.  And, where the charge did not

contain information to support the theory, it found the EEOC was not on notice of that claim.

*Id*.  The reasoning in *Hamilton* is persuasive.

Here, nothing in Plaintiff's EEOC charge would alert the EEOC to a claim of sexual

orientation discrimination.  Plaintiff's sparse EEOC charge asserted discrimination based on

"Race, Religion, Sex" and states only that he applied for 16 positions, was not provided a reason

for not being hired, and that Visa "has committed to increasing their underrepresented staff by

50% from 2020 to 2025."  He did not identify in his Charge who the successful job applicants

were, what their sexual orientation is, or when they were hired.  He did not allege sex

stereotyping or any facts to support such a theory in the Charge.  The only information he

states about himself in the Charge is that he had the experience necessary for the jobs for

which he applied but was not interviewed for any of the jobs.  Insofar as sexual orientation is

not information that would generally be known from a job application or about a successful job

applicant, absent some facts that would cause the EEOC to focus on the particular subset of sex

18

discrimination that is sexual orientation discrimination, the Charge cannot be deemed to have put the EEOC on notice of this claim.

Plaintiff's claim of disability discrimination also was not exhausted. There are no facts whatsoever that would put the EEOC on notice of such a claim based on Plaintiff's EEOC charge. *See Pinkard v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 5540 (FM), 2012 WL 1592520, at *8 (S.D.N.Y. May 2, 2012) (EEOC charge listed sex and age discrimination, but did not include allegations of discrimination stemming from the plaintiff's race or color, which were therefore not exhausted); *Espinoza*, 2022 WL 623809, at *6 (EEOC charge limited to claims based on race, ethnicity, and color, and thus, claim of disability discrimination was not exhausted); *De Lorenzo v. King Kullen Grocery Co.*, No. 19 Civ. 3460 (JMA) (AYS), 2020 WL 7047314, at *9 (E.D.N.Y. Aug. 12, 2020); *Quirino v. The New Jewish Home*, No. 19 Civ. 5778 (PAE) (DF), 2021 WL 11430534, at *9 (S.D.N.Y. Dec. 29, 2011) ("Courts have held that a claim alleging discrimination upon a protected classification that is different than the protected classification set forth in the EEOC charge is not reasonably related."), *report and recommendation adopted,* No. 19 Civ. 5778 (PAE) (DF), 2022 WL 142373 (S.D.N.Y. Jan. 14, 2022); *Toulouse v. Vill. Diagnostic Treatment Ctr.*, No. 15 Civ. 9387, 2018 WL 4682782, at *4 (S.D.N.Y. Sept. 28, 2018) (finding that plaintiff's sex and sexual orientation discrimination claims were not reasonably related to claims of disability discrimination).

In some instances, a plaintiff may provide supplemental information to the EEOC after the filing of a charge that will expand the scope of the charge. Indeed, Plaintiff acknowledges his EEOC charge did not include claims of sexual orientation and disability discrimination and

19

instead relies on a letter he submitted to the EEOC on August 19, 2024 to argue these claims were exhausted.  (FAC, at ¶ 21 n.2)

A charge may be amended to clarify and amplify allegations therein.  29 C.F.R. § 1601.12(b).  The applicable amendments will relate back to the date the charge was first received if they "allege additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge."  *Id*.  The Second Circuit has recognized that EEOC regulations do not allow written statements of facts to amend a charge, and that a supplemental affidavit submitted to the EEOC can only be deemed to amend a charge within the meaning of 29 C.F.R. 1601.12(b).  *Littlejohn v. City of New York,* 795 F.3d 297, 323 (2d Cir. 2015) (holding that letter sent to the EEOC including new allegations of a hostile work environment was insufficient to exhaust the plaintiff's administrative remedies, stating that "unsworn letters to the EEOC describing additional claims of discrimination unrelated to the claims described in the EEOC charge cannot enlarge the scope of the original charge to include new claims.") (internal citation, quotation marks, and alterations omitted); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2001) (holding that the plaintiff's after-charge-letter adding claims to the original charge did not allow the plaintiff to escape exhaustion and finding that the added claims were raised before the district court for the first time); *Vaughn v. Empire City Casino at Yonkers Raceway*, No. 14 Civ. 10297 (KMK), 2017 WL 3017503, at *13 (S.D.N.Y. July 14, 2017) (on summary judgment, allegations of hostile work environment raised in rebuttal statement to agency could not enlarge scope of charge and were not reasonably related for purposes of avoiding exhaustion requirement).  Thus, Plaintiff here cannot rely on his rebuttal letter because the new claims of sexual orientation and

20

disability discrimination do not clarify and amplify the claims initially included in the charge; rather, they are entirely new forms of discrimination.

Additionally, as Defendant points out, the rebuttal letter filed on August 19, 2024 was more than 300 days after the last date of discrimination noted in the EEOC charge, which was September 1, 2023.  (ECF No. 34-2, at 1)  Thus, the new claims of discrimination on the basis of sexual orientation and disability discrimination were also untimely.

Accordingly, the motion to dismiss should be GRANTED as to Plaintiff's claims of sexual orientation and disability discrimination under Title VII and the ADA, respectively, for failure to exhaust administrative remedies.  Insofar as these claims are now time-barred, the dismissal should be with prejudice.

### 2.    Title VII Disparate Treatment Claims

Plaintiff also asserts claims of race, national origin, gender, and religious discrimination under Title VII, which Defendant contends have not been sufficiently pleaded within the meaning of *Iqbal,* 556 U.S., at 678*,* and *Twombly*, 550 U.S., at 570.  Defendant argues in particular that Plaintiff does not plausibly allege that Defendant knew about any of his protected characteristics and identifies no other factual basis from which discriminatory intent may be plausibly inferred.  It also alleges that he fails to plead he was qualified for several of the roles.

There are generally two elements in a Title VII discrimination claim: (1) that an employer takes an adverse action against the plaintiff, and (2) that the plaintiff's protected characteristic "was a substantial or motivating factor contributing to the employer's decision to take the action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015); 42 U.S.C. §

21

2000e-2(a)(1).  "In the context of a claim for failure to hire, a plaintiff complaining of a discriminatory failure to hire must first make out a prima facie case of discrimination by showing that (1) he is a member of a protected class, (2) he was qualified for the job for which he applied, (3) he was denied the job, and (4) the denial occurred under circumstances that give rise to an inference of invidious discrimination." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, (1981) (holding that to plead a prima facie case of discrimination in hiring, a plaintiff must show he "applied for an available position for which [they were] qualified" but was "rejected").

When assessing whether a plaintiff has sufficiently pleaded a discrimination claim, the facts asserted in the complaint must "give plausible support to a minimal inference of discriminatory motivation."  *Littlejohn*, 795 F.3d at 311.  It is not necessary at the pleading stage for a plaintiff to provide additional facts that would support the plausibility of "the ultimate question of whether the adverse employment action was attributable to discrimination."  *Id*. The elements of a prima facie case guide the court's assessment of the pleading, but the focus of the court's inquiry is not whether a prima facie case has been pleaded but rather whether "the basic elements of a discriminatory action claim" have been pleaded.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *Maldonado v. George Western Bakeries*, 441 F. App'x 808 (2d Cir. 2011).  This means, in a failure to hire case, the facts pleaded must support a plausible inference that the defendant refused to hire the plaintiff because of his protected characteristic, such as by pleading that the person who was hired was not in Plaintiff's protected group.  *See Burdine*, 450 U.S. at 255 n. 8; 42 U.S.C. § 12112(a).  The rationale for this minimal burden at the pleading stage is that there is rarely "'direct, smoking gun, evidence of

discrimination,'" and plaintiffs "usually must rely on 'bits and pieces' of information to support an inference of discrimination, *i.e.,* a 'mosaic' of intentional discrimination." *Vega.,* 801 F.3d at 86 (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, (1981) (internal citations omitted).

Plaintiff here has pleaded few facts to suggest that Visa rejected his applications because of his race, sex, religion, or national origin. To start, he concedes that Visa's hiring personnel did not have access to applicants' self-reported demographic information and that he never disclosed any protected characteristic to Defendant. (FAC, at ¶ 87) In other words, insofar as all of Plaintiff's applications were rejected before the interview stage, the only information about Plaintiff came from his applications, which did not, by his own admission, explicitly identify his race, sex, religion or national origin (or sexual orientation or disability). Absent knowledge of Plaintiff's protected characteristics, then, *a fortiori*, a company cannot be found to have taken those characteristics into account. Courts in the Second Circuit routinely dismiss disparate treatment claims where the complaint does not allege employer knowledge of the trait at issue. *See e.g.*, *Giurca,* 2024 WL 763388, at *1 (upholding dismissal where the plaintiff failed to plausibly allege that the defendants had any knowledge of his protected status); *Shands v. Lakeland Cent. Sch. Dist.,* No. 15 Civ. 4260 (KMK), 2018 WL 3315738, at *17 (S.D.N.Y. July 5, 2018) (same); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003).

To overcome the fact that he can't identify a single person at Visa who was involved in the decision to reject his job applications and/or knew of his protected traits, Plaintiff argues that the decisionmakers knew at the very least that he is a White, Jewish male with an Eastern-European background based on his first and last-name, review of his social media accounts

23

(which he speculates were reviewed), and resume, which included the universities he attended (Yale and Colgate).  In other words, he suggests that the unnamed decisionmaker would have engaged in stereotyping to reach the conclusion that Plaintiff is a White, gay, Jewish male of Eastern European descent with HIV.[7]  There are no facts, however, that plausibly suggest someone at Visa actually reviewed his resume/application and engaged in such stereotyping and came to conclusions about Plaintiff's protected characteristics.

Next, even assuming that a decisionmaker was aware or assumed that Plaintiff is a White, gay, Jewish male of Eastern European decent with HIV, there are no facts plausibly supporting an inference that his job applications were rejected because of those traits.  As noted above, in the hiring context, it is sufficient to plead that the person who was hired was not in Plaintiff's protected group.  See *Burdine*, 450 U.S. at 255 n. 8.  Plaintiff has tried to do this by researching LinkedIn to identify the successful candidates for the sixteen positions and, to the extent he identified one, then engaged in stereotyping based on the candidate's name and other information on the LinkedIn profile.  (FAC, at ¶¶ 73, 109)  He fails to identify the successful candidate for seven of the positions, including Sr. Design Researcher (7), N.A. Digital Parnterships (8), V.P. Digital Partnerships (9), and Sr. Manager Digital Products (12), Director Ecosystem Risk Advising, Crypto Currency (13), Director Global Strategic Digital Partnerships (14), and Director, Future of Payments (16).  Thus, he has not provided any information about such candidates' protected characteristics, except for position number 8, which he speculates was given to a female.  It is unclear from the FAC how Plaintiff reached a conclusion about the

---

[7] Plaintiff provides no explanation for why he thinks a decisionmaker would have known about his sexual orientation or HIV status.

successful candidate's gender.  Absent facts identifying the successful candidates, it is impossible to know whether they where in the same protected groups as Plaintiff and impossible to make any inference that race, religion, national origin, sex, sexual orientation or disability were a basis for rejecting Plaintiff from the jobs by comparison to the successful candidates.

For the remaining positions, Plaintiff asserts that the successful candidates for positions 3, 5, and 10 were straight, White, Christian men; that the successful candidates for positions 2 and 11 were straight, Hispanic, Christian men; that the successful candidate for position 6 was a straight, White, Muslim male; and the successful candidates for position 1 and 4 were straight, White, Christian women.  However, it is unclear how Plaintiff identified these candidates' religion, sexual orientation and race.  It appears he engaged in guesswork and the same stereotyping of which he accuses Visa.  Plaintiff identifies only two positions where he claims the successful candidates were not White – positions 2 and 11, which he claims were filled by Hispanic men.  Plaintiff appears to have reached this conclusion because of the individual's names.  However, a name is not a reliable basis on which to infer a person's race or ethnicity.[8] Plaintiff does not make any allegations whatsoever about the successful candidates' national origin or disability.  Plaintiff contends that seven of the positions were filled by Christians, but again, this appears to be based on rank speculation.  He points to no facts to support his allegations about these candidates' religions.  Plaintiff contends that eight of the positions were filled by heterosexual people; but, again, he points to no facts to support his allegations about

---

[8] Even if the court were to accept his speculation about the race of the successful candidates, his race discrimination in hiring claim would relate to only two positions.

these candidates' sexual orientation.[9]   Finally, Plaintiff has identified two successful candidates

by name who he asserts are female, apparently based on their first names – position 1,

allegedly filled by Mischa Lumiere, and position 4, allegedly filled by Katherine Norwood.  It is

not clear whether "Mischa" signifies a female or why Plaintiff contends this person is female,[10]

though the Court acknowledges that "Katherine" is a name typically given to females.[11]   In

sum, Plaintiff has failed to allege facts about the successful candidates that are sufficient to

plausibly assert that they were not in his protected group with the possible exception of

position 4, which, based on the name of the supposedly successful candidate, was given to a

female.

Besides speculation and stereotyping, Plaintiff has included facts about Visa's DEI

policies in the FAC, which he asserts support a plausible inference that he was denied the

various positions to which he applied because of his various protected characteristics.  The core

facts regarding Visa's DEI program include an assertion that Visa wanted to increase the

number of women, Black, and Hispanic people in its workforce.  (FAC, at ¶ 47)  He also asserts

that publicly available statistics show a decline in the percentage of White male employees in

Visa's workforce in the period 2020 to 2023. (*Id.,* at ¶ 9)  He also conclusorily asserts that "Visa

has been promoting women with irrelevant experiences in healthcare and marketing into

senior partnership roles without regulated payments experience."  (*Id*., at ¶ 155)  Finally, he

---

[9] Thus, there is no factual support for a plausible claim of discriminatory failure to hire on the basis of sexual orientation, religion, national origin or disability by reference to the successful candidate of any position.

[10] While not necessarily a reliable source, the Court notes that the website "the Bump" states that "Mischa" is a gender-neutral name. https://www.thebump.com/b/mischa-baby-name (last visited January 16, 2025).  The Court does not rely on this website but just notes that this highlights the problem with inferring gender from a name.

[11] Thus, at best, if the court were to accept his assertion about the sex of the successful candidate for position 4, his sex discrimination in hiring claim would relate to only one positions

conclusorily asserts that Visa's hiring algorithms and DEI practices excluded disabled candidates and failed to use disability-inclusive criteria but does not specify what he means or how this came into play with respect to his having HIV.  (*Id.*, at ¶ 213) What is lacking from the FAC are facts suggesting that the DEI policies in fact came into play in the decision to reject Plaintiff's application for the positions to which he applied or that the DEI policies were implemented in a way to exclude Plaintiff from job opportunities because of his protected characteristics.

It is not unlawful to value diversity – indeed it is laudable.  It is not unlawful to ensure that hiring processes and job criteria do not create artificial, discriminatory barriers to employment.  Indeed, Title VII and other employment non-discrimination laws require this.  It is not unlawful for a company to have broad advertising of jobs and targeted recruitment efforts to ensure all potentially qualified and interested applicants are aware of job openings and have an equal opportunity to compete for jobs.  When DEI programs are implemented correctly, they are implemented to ensure *inclusion* of everyone (including White males) and to eliminate discriminatory barriers to employment.  The "I" in DEI stands for inclusion.  The "E" in DEI stands for equity, meaning free from bias or favoritism.  To put it plainly:  DEI does not mean discrimination – DEI programs generally are implemented to combat discrimination.  Nor is DEI the same as affirmative action, with which it is often improperly conflated.

Thus, Plaintiff's allegations about Visa's DEI initiatives for its workforce do not give rise to a plausible inference of discrimination in connection with the rejection of Plaintiff for any of the positions in question.  Further, the broad statistics about workforce demographics included in the FAC say nothing about *how* a DEI program was implemented.   The FAC does not contain any facts to plausibly infer that Visa implemented its workforce DEI initiatives to exclude

27

candidates with Plaintiff's protected characteristics, let alone to exclude Plaintiff from the sixteen positions to which he applied. *See Bernstein v. St. Paul Companies, Inc.*, 134 F. Supp. 2d 730, 739 n.12 (D. Md. 2001) (an employer's "commitment to 'diversity,' if expressed in terms of creating opportunities for employees of different races. . ., is not proof of discriminatory motive with respect to any specific hiring decision.'"); *Musa v. Soar Corp.*, 12-cv-2847, 2014 WL 6809019, at *7 (E.D. Pa. Dec. 1, 2014) (quoting *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999)("having a diverse workforce does not violate Title VII: 'an employer has every right to be concerned with the diversity of its workforce, and work environment.'"); *Mangold v. PECO Engergy*, 2021 WL 6072818, at *16, 2021 Fair Empl.Prac.Cas. (BNA) 489,247 (E.D.PA Dec. 23, 2021) (same, collecting cases). Indeed, many of the positions to which Plaintiff applied were allegedly filled by men or persons alleged to be White, undercutting his suggestion that Visa was tipping the scales in favor of Black and Hispanic applicants or women through its DEI initiatives.[12] In sum, the allegations about Defendant's DEI programs do not support an inference that Plaintiff's applications were rejected because of his various protected characteristics. *Moss v. Bd. of Educ. of the Sachem Cent. Sch. Dist.*, No. 22 Civ. 6212 (JS) (SIL), 2024 WL 3328637, at *8 (E.D.N.Y. July 8, 2024) (granting motion to dismiss where Plaintiff allegations did not possess "the connective tissue that links his protected status to the alleged failure to hire ... save for his own speculation."); *see also See Burgis v. New York City Dep't. of Sanitation*, 798 F.3d 63, 69 n.5 (2d Cir. 2015) (affirming dismissal of the plaintiffs' discrimination claim, reasoning that "broad statistical evidence, without evidence of specific instances of

---

[12] The allegations about Visa's DEI programs do not address religion, sexual orientation, national origin, and disability. (FAC, at ¶ 208)

discrimination, is not relevant to whether any specific individual acted with discriminatory intent or whether any specific individual was the target of discrimination."); *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) ("Statistics alone do not suffice to establish an individual disparate treatment claim for a very good reason: the particular plaintiff must establish he was the victim of racial discrimination.") (emphasis in original); *see also Lomotey v. CT Dep't of Transp.*, 355 Fed. Appx. 478, 481 (2d Cir.2009) (summary order) ("[The plaintiff's] evidence that only Caucasians were selected for [job] placements amounts to nothing more than raw numbers which, without further information on key considerations such as the racial composition of the qualified labor pool, cannot support an inference of discrimination."); *Taylor v. City of New York*, 207 F.Supp. 3d 293, 305 (S.D.N.Y. Sept. 13, 2016) (granting motion to dismiss failure to hire claim where plaintiff failed to allege facts plausibly suggesting that her race, color or national origin were a factor in the decision).

Other facts in the FAC undercut any inference of discrimination with respect to some of the positions.  For example, the FAC indicates that positions 1, 2 and 3 required applicants to either live in the location where the job was located and/or have foreign language proficiency. Specifically, the position VP, Head of Design, Visa Innovation (1) required the successful applicant to live in San Francisco; the position Senior Director, Strategy and Monetization (3), required that the successful applicant live in Austin, Atlanta, or San Francisco; and the position VP, Fintech Partnerships (2) required that the successful applicant both reside in Miami, Florida and be proficient in Spanish.  (*Id.*, at ¶¶ 112, 135)  Residency and language requirements are lawful job criteria and are legitimate, non-discriminatory reasons on which to base a hiring decision and can rebut a prima facie case of discrimination.  *See e.g., Idlisan v. N.Y. State Dep't*

29

*of Tax & Fin.*, No. 12 Civ. 1787 (MAD) (CFH), 2014 WL 3888279, at *8 (N.D.N.Y. Aug. 7, 2014) (granting motion for summary judgement in failure to hire case, noting that Plaintiff did not indicate desire to relocate to Albany and that fact that applicant lived outside the geographic location of the job is a legitimate business reason to reject a job applicant); *Cooper v. Conn. Pub. Def.'s Off.*, 480 F.Supp.2d 536, 546-47 (D. Conn. 2007) (granting motion for summary judgment and noting that foreign language fluency is a legitimate business reason on which to base a hiring decision).  The FAC does not assert that Plaintiff included his desire/willingness to relocate in his application for these position, and he concedes he is not proficient in Spanish. While a court does not normally consider an employer's legitimate business reason for a hiring decision on a motion to dismiss, it may consider whether the Plaintiff has plausibly alleged he was qualified for the positions for which he applied and was not hired.  Plaintiff has included facts about the reasons given for rejection of his application for these positions and does not dispute that Spanish proficiency, was required for position 2 and that he did not meet this qualification.  Thus, Plaintiff has conceded that he is not qualified for position 2.  He also fails to allege facts from which Visa would have been able to discern he was qualified for positions 1, 2 and 3 in that he does not plead that he informed Visa in his application that he was willing to relocate to San Francisco, Austin or Atlanta such that he could meet the qualification of living in the geographic location for these jobs.  Additionally, as noted above, Plaintiff has not pleaded what the minimum job qualifications were for any of the positions to which he applied or stated why he met the qualifications—all he has done is tried to compare his education and experience with the education and experience of some of the successful candidates that cherry-picked from LinkedIn.  *DiResta v. Biz2Credit Inc.*, No. 21 Civ. 208 (LJL), 2021 WL 6052104, at *4

(S.D.N.Y. Dec. 20, 2021) (dismissing complaint in a failure to hire case when the plaintiff failed to allege "sufficient facts to show he was qualified for" the position he applied to).[13]

In a similar vein, the FAC alleges that three of the positions were not filled (positions 13 - 15) (FAC ¶¶ 176-80) and one he applied to after it was filled (position 16).  No discriminatory failure to hire claim can be plausibly asserted in these circumstances.  *See Meyenhofer v. Larsen & Toubro Infotech Ltd.,* 503 F.Supp. 3d 39, 49 (S.D.N.Y. 2020) (dismissing a complaint of one plaintiff for failure to state a claim when the plaintiff did not show that he was "denied the job" to "which he applied.") (quoting *Szewczyk v. City of New York*, No. 15 Civ. 918 (MKB), 2016 WL 3920216, at *4 (E.D.N.Y. July 14, 2016); *Singh*, 2021 WL 1199469, at *6 (on motion for summary judgment, stating "[o]ne can hardly claim that he was discriminated against through a company's failure to hire him when he applies to a job that has already been filled; to hold otherwise would invite a flood of meritless claims.").

When considering the FAC in its entirety, the Complaint fails to include non-conclusory facts sufficient to plausibly infer that Plaintiff was rejected for any of the positions due to any of his protected characteristics.  Because it is conceivable Plaintiff may be able to add facts that would render his discriminatory failure to hire claims plausible, these claims should be DISMISSED without prejudice.

### 3.    Title VII Retaliation Claim

I next address Plaintiff's Title VII retaliation claim.  The elements for a *prima facie* case of retaliation under Title VII are: "(i) a plaintiff was engaged in protected activity; (ii) the alleged

---

[13] The Court notes, however, that according to the FAC, Visa considered Plaintiff qualified jobs 4-12, just "less qualified" than the successful candidate.  From this, it appears plausible that Plaintiff met the minimum qualifications of jobs 4-12 assuming the facts pleaded are true.

retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002)). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id*. (quoting *Littlejohn*, 795 F.3d, at 319).  The Second Circuit has held that "Title VII's anti-discrimination and anti-retaliation provisions are not coterminous; anti-retaliation protection is broader and extends beyond workplace-related or employment-related retaliatory acts and harm." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)  Indeed, "[r]etaliation claims may be brought by applicants for employment, if the retaliatory conduct is related to the employment application." *Suri v. Foxx*, 69 F.Supp.3d 467, 476 (D.N.J. 2014).  For purposes of determining whether Title VII retaliation claims are sufficiently pled to avoid dismissal pursuant to Rule 12(b)(6), the Court assesses only whether the plaintiff has plausibly alleged that the defendant discriminated or took an adverse employment action because the plaintiff has opposed an unlawful employment practice.  *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018).

Plaintiff's retaliation claim is premised on him being, in essence, blacklisted from hiring by Defendant due to filing the EEOC Charge and the instant lawsuit.  He alleges that a lawyer for Defendant told him that he was placed on a "do not hire" list after he filed an EEOC charge as a

32

result of that charge.  (FAC ¶¶ 43, 214)  Defendant argues that because Plaintiff did not apply for any jobs after he filed his EEOC charge, there can be no claim or retaliation because there is no adverse action.  This argument is not persuasive.

First, it need not be belabored that by filing an EEOC charge and a subsequent lawsuit, Plaintiff engaged in protected activity.  *See Lopez v. White Plains Hosp.,* No. 19 Civ. 6263, 2022 WL 1004188, at *13 (S.D.N.Y. Mar. 30, 2022) ("The caselaw is clear that plaintiffs engage in protected activity when they file ... external discrimination complaints against their employer.") (collecting cases); *Atherley v. N.Y.C. Dep't of Educ.,* No. 23 Civ. 383, 2024 WL 1345741, at *11 (S.D.N.Y. Mar. 29, 2024) (concluding that the "[p]laintiff's filing of an EEOC [c]harge ... constitute[d] protected activity because she alleged that Defendants employment practices violated Title VII.")  Second, Plaintiff has asserted that Defendant was aware of his EEOC charge and this lawsuit.  Indeed, Plaintiff points to a conversation he had with Visa's VP of Global Litigation on March 21, 2025, after he received his notice of right to sue and commenced the instant action.  In that conversation Plaintiff alleges that Visa's lawyer told him that he had been placed on the "do-not-hire" list *as a result of* bringing the suit.  (FAC, at ¶ 43)  Not only does this allegation plausibly demonstrate Defendant's knowledge of the protected activity, but it also demonstrates that it placed Plaintiff on the do-not-hire list because of the protected activity.

As to Visa's argument that placement on a do-not-hire list does not constitute an adverse action, the case law is clear that a materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (cleaned up).  Placing an

applicant who has accused a company of discriminatory failure to hire on a do-not-hire list is the type of action that would discourage the applicant from re-applying for jobs and chill an applicant's pursuit of a discrimination claim.  *See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018) (noting that diminished opportunities for work constitute an adverse employment action).  Further, at least one court has construed allegations of blacklisting as a form of retaliatory failure to hire.  *See, e.g., Parker v. Philadelphia Newspapers, Inc.*, 322 F. Supp. 2d 624, 628 (E.D. Pa. 2004); *see also Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 890 (7th Cir. 1996) ("The ability to 'blacklist' a former employee, and thus foreclose future employment possibilities, is but one example of an employer's power to punish a former employee for the exercise of her Title VII rights."). Reapplication is not required where retaliation renders it futile.  *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993) ("[A] plaintiff's failure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor.").  By virtue of placing Plaintiff on the do-not-hire list, any reapplication would have been futile.  Thus, Plaintiff need not allege termination or rejection after applying to survive a motion to dismiss.  *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) ("A consistently enforced [ ] policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.").

Defendant's citation to *Rogers v. Fashion Inst. of Tech.*, No. 14 Civ. 6420 (AT), 2016 WL 889590, at *9-10 (S.D.N.Y. Feb. 26, 2016), is inapposite as the plaintiff in *Rogers* neither alleged what, if any, adverse employment actions were taken against him for his complaints of

34

discriminatory practices nor established a causal connection between a retaliatory action and the protected conduct. *Id.*, at \*7.

For these reasons, I respectfully recommend that Defendant's motion to dismiss Plaintiff's Title VII retaliation claim be DENIED.

### 4.    Title VII Hostile Work Environment Claim

Plaintiff asserts that Visa created a hostile work environment for job applicants. While the Court sympathizes that the job market is very difficult and that it is difficult to face numerous rejections of one's job applications, the allegations of a hostile work environment must be dismissed. To state a claim for a hostile work environment under Title VII, a plaintiff "must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, ... creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of" the plaintiff's membership in a protected class. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (citation omitted). A hostile work environment claim may stem from "a single incident [that] was extraordinarily severe, or ... a series of incidents [that] were sufficiently continuous and concerted to have altered the conditions of [the plaintiff's] working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). But, "[i]solated incidents or 'episodic' stray

35

remarks are not 'sufficiently continuous and concerted in order to be deemed pervasive.'" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

It is axiomatic that there must be an employer-employee relationship to sustain a claim for hostile work environment. *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 838 (2d Cir. 2022) (affirming district court's dismissal of a Title VII claim because the plaintiff could not establish "that an employer-employee relationship existed between the parties at the time of the alleged unlawful conduct.") (quoting *Gulino v. N.Y.S. Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006)). Here, Plaintiff does not at any point allege that an employer-employee relationship existed between himself and Defendant – nor could he – because the gravamen of this case is Visa's failure to hire Plaintiff. Plaintiff argues that "any individual" may bring a Title VII hostile work environment claim so long as their employment is controlled by the defendant, citing *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054 (2d Cir. 1982) and *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir.1995). However, neither of those cases involve hostile work-environment claims; rather, both involve wrongful discharge claims and situations where there was an existing employee-employer relationship.

Courts in this district have regularly dismissed similar hostile work environment claims when a plaintiff has failed to plausibly allege the existence of a work relationship between the parties. *See Spindel v. Kroll, LLC*, No. 23 Civ. 9961 (GHW) (JW), 2024 WL 3995048, at *10 (S.D.N.Y. Aug. 15, 2024), *report and recommendation adopted*, No. 23 Civ. 9961 (GHW) (JW), 2024 WL 3992398 (S.D.N.Y. Aug. 28, 2024) (dismissing the plaintiff's hostile work environment claim under the NYSHRL and NYCHRL (which adopts the same employer-employee requirement as Title VII) because he was never an employee of the defendant); *Wang v. Phoenix Satellite*

36

*Television US, Inc.*, 976 F.Supp.2d 527, 537 (S.D.N.Y. 2013) (same).  Accordingly, I respectfully recommend that Plaintiff's Title VII hostile work environment claim be DISMISSED.  This claim should be dismissed with prejudice because it is futile.

### 5.    NYSHRL and NYCHRL Claims

Both the NYSHRL and the NYCHRL, like Title VII, also make it unlawful for employers to discriminate against prospective employees based on protected characteristics, including race, religion, ethnicity, gender, sexual orientation, and disability.  *See* N.Y. Exec. Law § 296(1)(b); N.Y.C. Admin. Code § 8–107(1)(a).  However, unlike Title VII, claims under the NYSHRL and NYCHRL do not require administrative exhaustion.  Thus, the Court can consider Plaintiff's claims of sexual orientation and disability discrimination along with his claims of sex, sexual orientation, race, religious, and national origin discrimination, under state and local law.  *See Brock v. Prime Now LLC*, No. 20 Civ. 9055 (VEC) (OTW), 2021 WL 4267849, at *4 n.7 (S.D.N.Y. Aug. 26, 2021) ("NYSHRL and NYCHRL do not require exhaustion of administrative remedies.") (citing *Medina v. Waste Connections of New York, Inc.*, No. 19 Civ. 291 (RA), 2019 WL 3532048, at *5 n.6 (S.D.N.Y. Aug. 2, 2019))

As a general matter, the court must construe the NYSHRL and NYCHRL more broadly "in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Syeed v. Bloomberg L.P.*, 235 N.E.3d 351, 354 (N.Y. 2024) (quoting *Albunio v. City of New York*, 947 N.E.2d 135, 137 (N.Y. 2011) (internal quotation marks omitted); N.Y. Executive Law § 300; New York City Administrative Code, § 8-130.[14]  To state a claim of discrimination under the

---

[14] While the standards under the NYSHRL previously was more akin to that application to Title VII claims, the NYSHRL was amended in 2019 to apply a rule of liberal construction such that the standard is now more akin to the one applicable to the NYCHRL.  *See Qorrolli v. Metropolitan Dental Assocs., D.D.S.*, 124 F.4*th* 115, 123 (2d Cir. 2024) (stating that the NYSHRL "was amended in 2019 to align with the NYCHRL's more liberal pleading standard");

NYSHRL or NYCHRL, a plaintiff "must allege that, compared to similarly situated employees, she experienced differential treatment – that she is treated *less well* – because of a discriminatory intent." *Mumin v. City of New York*, 760 F. Supp. 3d. 28, 52 (S.D.N.Y. 2024) (emphasis added); *accord Mihalik v. Credit Agricole Cheuvreux N. Am.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013).

Insofar as Plaintiff's  claims of discriminatory failure to hire on the basis of gender, race, national origin, and religion are insufficiently pleaded under Title VII, therefore, they are also insufficiently pleaded under the NYSHRL and NYCHRL for the same reasons discussed above. The analysis of Plaintiff's sexual orientation and disability discriminations claims fail for like reasons – namely, that Plaintiff does not allege that he identified his sexual orientation or disability to Visa or that Visa was aware of these protected traits such that Visa could have taken them into account.  Nor does he allege facts from which the Court could plausibly infer that disability or sexual orientation played a role in rejecting Plaintiff for the positions given that there is no non-speculative factual basis for knowing whether any of the successful candidates had a disability or what their sexual orientation is.

As for Plaintiff's state and city law retaliation claims, the same general standards govern as in Title VII cases.  *Farmer*, 473 F. Supp. 3d, at 330.  Like Title VII, both the NYSHRL and the NYCHRL make it unlawful to retaliate against individuals who file a complaint against their employer or prospective employer.  *See* N.Y. Exec. Law § 296(7); N.Y.C. Admin. Code § 8–107(7).  And, the rule of construction for the NYSHRL and the NYCHRL has "created a 'one-way ratchet,' by which interpretations of . . . federal civil rights statutes can serve only as a *floor* below which

---

*Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021) (noting the amended N.Y. Exec. L. § 300 "render[s] the standard for [NYSHRL] claims closer to the standard of NYCHRL").

the [ ] Human Rights laws cannot fall." *Mihalik*, 715 F.3d at, 109. Therefore, because Plaintiff

has plausibly alleged retaliation in violation of Title VII, he also has done so under the state and

city analogs. While Defendant may eventually be able to demonstrate that Plaintiff was placed

on a do-not-hire list for a "legitimate, non-retaliatory reason," *Zann Kwan v. Andalex Grp. LLC*,

737 F.3d 834, 845 (2d Cir. 2013), at this stage of the litigation, the motion to dismiss should be

denied.

To the extent Plaintiff also asserts a hostile work environment claim under the NYSHRL

and NYCHRL as a standalone cause of action, such a claim fails as a matter of law for the same

reasons the Title VII hostile work environment claim fails. Hostile work environment claims

under state and city law require the existence of an employer-employee relationship and

cannot be extended to failure-to-hire claims. Stated differently, "[e]ven though the word

'person' is used in the NYSHRL and the NYCHRL, the statutes still only refer to an employee."

*See Wang v. Phoenix Satellite Television US, Inc.*, 976 F.Supp. 2d 527, 532 (S.D.N.Y., 2013) (citing

*Weir v Holland & Knight, LLP*, No. 603204/07, 2011 WL 6973240 (Sup. Ct. N.Y. Cty. Dec. 9,

2011)). Because Plaintiff was never Defendant's employee, he cannot assert claims under state

or municipal human rights laws against the Defendant for hostile work environment.

In sum, I recommend granting the motion to dismiss without prejudice as to all of

Plaintiff's state and city failure to hire claims. I recommend denying the motion to dismiss as to

Plaintiff's state and city law claims of retaliation. And, I recommend granting the motion to

dismiss with prejudice as to Plaintiff's state and city law claims for hostile work environment.

**6.    Title VII Disparate Impact Claim**

The FAC alleges that Defendant's ostensibly neutral hiring mechanisms like geographic requirements and allegedly non-neutral screening practices such as DEI balanced slates and incentives produced systemic disparities disadvantaging White men and individuals with Plaintiff's intersecting demographic traits.  (FAC, at ¶¶ 21, 45-58, 87, 90, 100, 189, 212)

Disparate impact claims address employment practices that are facially neutral but disproportionately affect members of a protected class or classes and are not otherwise job-related and consistent with business necessity.  Under the disparate impact framework, a plaintiff can establish a *prima facie* case by alleging facts that "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two."  *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020) (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012)).  Title VII does not require a plaintiff to plead a *prima facie* case of disparate impact to survive a motion to dismiss. Instead, it simply requires a plaintiff to "assert [enough] nonconclusory factual matter ... to nudge [her] claim[ ] across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014).  To nudge a disparate impact claim from conceivable to plausible, "[t]he complaint must identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." *Rizzo v. N.Y.C. Dep't of Sanitation*, No. 23 Civ. 7190 (JMF), 2024 WL 3274455, at *4-5 (S.D.N.Y. July 2, 2024).

As to the neutrality of Defendant's policies, Plaintiff specifically alleges that Defendant's "DEI policies are not facially neutral" (FAC, at ¶ 189) as would be required when asserting a

40

disparate impact claim.  *See Housing Rights Initiative v. Compass Inc.*, No. 21 Civ. 2221 (SHS), 2023 WL 2989048, at *1 (S.D.N.Y. Apr. 18, 2023) ("[A] plaintiff making a disparate impact claim must allege that a *facially neutral policy* actually or predictably results in a disparate impact on a group of persons. . ." (emphasis added).  Consequently, Plaintiff's own allegations have effectively foreclosed any disparate impact theory premised on Defendant's DEI practices.  *See Tsombanidis v. West Haven Fire Dept.,* 352 F.3d 565, 574-75 (2d Cir. 2003) ("[D]isparate impact analysis focuses on facially neutral policies or practices that may have a discriminatory effect.");  *see also E.E.O.C. v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1273 (11th Cir. 2000) (holding that a facially neutral policy is a prerequisite for a disparate impact claim).

Additionally, Plaintiff does not allege which discrete aspect of Defendant's DEI policy impacted him and those similarly situated.  *See Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 159 (2d Cir.1991) ("[Title VII] places an initial burden on the plaintiff to show that the *specific* factor challenged under the disparate impact model results in the discriminatory impact") (emphasis added); *Trezza v. The Hartford, Inc.*, No. 98 Civ. 2205 (MBM), 1998 WL 912101, at *7 (S.D.N.Y. December 30, 1998) ("[A] plaintiff must identify a specific employment practice and provide evidence sufficient to raise an inference that the  identified practice caused significant adverse effects on the protected group").  By failing to allege with any specificity which of Defendant's DEI practices he is challenging, Plaintiff's disparate impact claim fails.  *See Collette v. St. Luke's Roosevelt Hosp.,* 132 F. Supp. 256, 277 (S.D.N.Y. 2001) (dismissing a disparate impact claim under Rule 12(b)(6) because the individual plaintiff failed to allege a specific hiring

policy that resulted in a disparate impact to Jewish individuals, and that failing to post two job-openings was an "isolated lapse" rather than a broader policy).

Most critically, as to his allegations of disparate impact from geographic limitations and DEI policies generally, none of Plaintiff's allegations identifies a single other applicant who shares his traits and was not interviewed or hired by Defendant.  Put simply, his allegations are entirely based on Defendant's treatment of *him* (FAC, at ¶ 86), rather than any group-level comparison showing that a protected group fared worse than a similarly situated group under a particular policy.  Courts generally reject such pleadings, holding that a plaintiff cannot survive a motion to dismiss on a disparate impact claim where he cannot point to any other affected individuals or statistics about the size and outcomes of the alleged group.  *See e.g.*, *Brown v. S. Shore Univ. Hosp*., 762 F. Supp. 3d 191, 215 (E.D.N.Y. 2025) (dismissing Plaintiff's disparate impact claim under Rule 12(b)(6) for failing to offer "factual allegations supporting the proposition that in addition to [the plaintiff], other employees of Defendants," who were similarly situated to the plaintiff, suffered  from the same type of alleged exclusionary treatment) (emphasis in original);  *Mandala,* 975 F.3d at 209-10 (finding that for disparate

impact claims, statistical data "must … focus on the disparity between appropriate comparator groups").

Accordingly, Defendant's motion to dismiss the disparate impact claim should be GRANTED. Because it is conceivable Plaintiff might be able to assert facts to support a disparate impact claim, this claim should be dismissed without prejudice.

### 7.    Section 1981 Claim

Plaintiff's Section 1981 theory focuses on the claim that Visa excluded him from programs and competitions for start-up companies such as She's Next, IFundWomen, and the Visa Everywhere Initiative. Defendant moves to dismiss the claim on the ground that Plaintiff lacks standing to bring a claim because Plaintiff never alleges that he applied to any program, attempted to apply to such a program, or took any step toward forming a contractual relationship with Defendant.

Section 1981 protects the right "to make and enforce contracts" free from intentional race discrimination, 42 U.S.C. § 1981(a)-(b), and requires a plaintiff to plausibly allege "facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).

To start, the Court notes that Plaintiff concedes that She's Next was a program delineated by gender, not by race as contemplated by Section 1981. (FAC, at ¶ 56) IFundWomen, also appears to be a program for women entrepreneurs. And he asserts that the

third program, VEI, was open to him and that the finalists in 2019 were almost exclusively White males.  (FAC, at ¶ 56)   Absent an allegation of race discrimination in connection with these programs, no Section 1981 can lie.  *See Albert,* 851 F.2d, at 572 ("Section 1981 was intended to combat racial or ethnic discrimination, nothing more."); *Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 69 (2d Cir. 2000) (finding that plaintiff must show purposeful *racial* exclusion); *Albert v. Carovano*, 851 F.2d 561, 571-72 (2d Cir. 1988) (same).   Plaintiff suggests that White men are excluded from these programs, but it appears all men are excluded because both programs are for women entrepreneurs.  In other words, gender, not race, appears to have been the primary barrier to participation in these programs.

Additionally, Plaintiff has not alleged any facts demonstrating that he submitted, or was capable of submitting, an application to She's Next or IFund Women.  He fails to allege that his start-up companies otherwise met the criteria for participating in the programs and that it was his race that was the basis he was disqualified from participating in the programs.  Nor does he allege he applied for and was rejected from these programs.  The third program he identifies is VEI, which he concedes he was not excluded from based on a protected trait and fails to include any facts about the criteria for the program, why his companies qualified for the program, or that he applied for and was rejected for the program.  Thus, he fails to raise a plausible claim under Section 1981 regarding alleged exclusion from these programs.  *See Samuels v. New York City*, No. 23 Civ. 10045 (AS), 2024 WL 3742544, at *2 (S.D.N.Y. Aug. 9, 2024) (granting motion to dismiss when a male plaintiff failed to allege that applying for a grant intended for females

would have been futile, that he was ready and able to apply, what the requirements for the grant were, or whether the plaintiff met those requirements).[15]

In the FAC, Plaintiff cites to his Visa credit card agreement and Developer Platform Terms in connection with his Section 1981 claim but does not allege that Visa ever altered any terms vis-à-vis him or denied him a credit card, much less on the basis of his race or ethnicity. (FAC, at ¶ 36)  Accordingly, Plaintiff has failed to identify a contractual basis for a Section 1981 claim with regard to the Developer Platform or credit card offerings.  *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 479-80 (2006) (rejecting a Section 1981 claim where alleged interference concerned expectations, not an actual contract).

For all of the above reasons, Defendant's motion to dismiss the Section 1981 claim should be GRANTED.

### 8.    Motion to Strike

Defendant moves to strike various allegations in the FAC that it contends are irrelevant to the discrimination claims asserted.  Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Therefore, a complaint's statement of claim should not be prolix (lengthy) or contain unnecessary details. *Crumell v. City of New York*, No. 23 Civ. 2042 (LTS), 2023 WL 2974199, at *3 (S.D.N.Y. Apr. 13, 2023) (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)).  The purpose of the rule is to avoid "an unjustified burden on the court and the party who must

---

[15] He also fails to assert any facts indicating that the decisionmakers for either She's Next or VEI program knew the race of any applicant, that he was comparable to applicants of another race who were chosen instead of him, or any other allegations that would plausibly suggest discriminatory intent. *Annabi*, 2024 WL 4252062, at *7.

respond to it because they are forced to select the relevant material from a mass of verbiage." *Thompson v. Lemon*, No. 23 Civ. 2102 (LTS), 2024 WL 1861155, at *3 (S.D.N.Y. Apr. 29, 2024).

Under Rule 12(f) a Court may strike any "redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. Pro. 12(f).  "To prevail on a Rule 12(f) motion to strike, a party must demonstrate ... (1) [that] no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Winklevoss Capital Fund, LLC v. Shrem*, 351 F. Supp. 3d 710, 721 (S.D.N.Y. 2019) (alteration and internal quotation marks omitted).  In evaluating a Rule 12(f) motion, courts should not "strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).  "As such, motions to strike are viewed with disfavor and infrequently granted." *Winklevoss*, 351 F. Supp. 3d at 722 (internal quotation marks omitted).  "Inappropriately hyperbolic allegations, ill-conceived attempts at levity, and other similar manifestations of bad judgment in drafting pleadings, by themselves, fall short of the threshold that Rule 12(f) contemplates." *Tucker v. Am. Int'l Grp.*, Inc., 936 F. Supp. 2d 1, 15-16 (D. Conn. 2013).

In considering Defendant's request to strike portions of the pleading, the Court should distinguish between allegations that are merely inflammatory or speculative and those that, even if contested, bear some logical relationship to Plaintiff's theories of discrimination or pretext.  Allegations that Visa is engaged in antitrust misconduct or operates as a monopolist should be stricken.  Those assertions are not tethered to the elements of Plaintiff's employment discrimination claims and risk confusing the issues, inviting confusion on complex competition

46

law questions that have no bearing on whether Plaintiff was unlawfully denied employment. For the same reason, allegations concerning purported antitrust violations by individuals hired for positions Plaintiff did not apply for are irrelevant to the claims asserted in this action and should likewise be stricken, as they do not advance any cognizable inference regarding Plaintiff's own applications or Visa's motives in rejecting them.  Similarly, allegations suggesting that hiring decisions were driven by political connections or conspiratorial favoritism are speculative, unsupported by any facts, and unfairly prejudicial; they stray well beyond permissible pleading and should be trimmed under Rule 12(f).  Finally, Plaintiff's references to Visa's alleged funding of Black Lives Matter ("BLM") and the Tides Center are offered as circumstantial support for his assertion that Visa's corporate culture or DEI initiatives fostered antisemitic bias.  Public statements Plaintiff cites and attributes to these organizations and their affiliates, while at times critical of the State of Israel, do not on their face evince animus toward Jewish people generally and there are no non-speculative facts to suggest that Visa endorses all of the views of these organizations that are not parties to this action.  Moreover, even at the pleading stage, the purported statements of these organizations are immaterial and far too attenuated to Visa's hiring process.  Finally, because these allegations inject inflammatory and irrelevant matter into the complaint, they are properly deemed unsupportable, immaterial, and prejudicial under the meaning of Rule 12(f) and should be stricken.

On the other hand, the other allegations concerning other candidates being considered or hired under criteria Plaintiff contends were applied inconsistently are arguably relevant to

47

the claims of discriminatory hiring.  Accordingly, these allegations should not be stricken at this stage, as they arguably relate to the discrimination claims.

I therefore recommend that Defendant's motion to strike be GRANTED in part and DENIED in part.  Specifically, Paragraphs 76-77 (referring to Visa's relationship with BLM and BLM's alleged links to Hamas); Paragraphs 61-67, 223 (referring to antitrust violations); Paragraphs 165-67 (referring to political connections); and Paragraphs 219-20, 227 (referring to monopolist practices) should be stricken.

### 9.    Leave to Amend

When a motion to dismiss is granted, particularly when the plaintiff is a pro se litigant, the usual practice is to dismiss the claims without prejudice and grant the plaintiff leave to amend the complaint.  *Hayden v. Cnty. of Nassau,* 180 F.3d 42, 53 (2d Cir. 1999).  Indeed, pro se plaintiffs are entitled to a lenient standard for amending pleadings under Rule 15(a).  *Tracy*, 623 F.3d, at 101; *LeSane v. Hall's Sec. Analyst, Inc*., 239 F.3d 206, 209 (2d Cir. 2001); *Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir. 1994); *Holmes v. Goldin*, 615 F.2d 83, 85 (2d Cir. 1980); *see also Ortiz v. Local 32BJ*, No. 07 Civ. 8030 (LTS) (KNF) 2008 WL 2604810, at *3 (S.D.N.Y. June 25, 2008).  Consequently, "[d]istrict courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile."  *Daniels v. Wyndham Destinations*, No. 25 Civ. 2208 (LLS), 2025 WL 2430671, at *2 (S.D.N.Y. Aug. 21, 2025).  Proposed amendments are futile when they would fail to state a claim under Rule 12(b)(6).  *IBEW Local Union No. 58 Pension Tr. Fun & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (quoting *Panther Partners Inc. v. Ikanos Commc'ms, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)).  Since determination of futility is subject to the same

standards as a motion to dismiss under Rule 12(b)(6), "futility is generally adjudicated without resort to any outside evidence," so the court must accept all facts pleaded as true and draw all reasonable inferences in plaintiff's favor. *Wingate v. Gives*, No. 05 Civ. 1872 (LAK) (DF), 2009 WL 424359, at \*5 (S.D.N.Y. Feb. 13, 2009) (citing *Nettis v. Levitt*, 241 F.3d 186, 194, n.4 (2d Cir. 2001)).

Here, Defendant does not overtly oppose a potential amendment to the pleading or explain why amendment would be futile on the merits. Instead, Visa simply argues that further amendment would be futile because the complaint in this matter has already been amended once. That argument is not persuasive as a general matter, as some of the claims could conceivably be supplemented with additional factual support to render them plausible. Also, the fact that Plaintiff could have amended earlier (or has already amended the complaint once) is not alone sufficient to defeat further amendment, particularly in light of Plaintiff's pro se status. *See Francisco v. Abengoa, S.A.*, No. 15 Civ. 6279 (ER), 2021 WL 4136899, at \*17 (S.D.N.Y. Sept. 10, 2021). Accordingly, Plaintiff should be afforded another opportunity to amend his pleading as to all of the claims except the Title VII sexual orientation discrimination, the ADA disability discrimination claim, and all hostile work environment claims because these claims, as discussed above, are futile.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that Defendant's motion to dismiss (ECF No. 32) be GRANTED without prejudice as to: Plaintiff's disparate treatment claims for race, national origin, sex and religion under Title VII; Plaintiff's disparate impact claims under Title VII; Plaintiff's disparate treatment claims under the NYSHRL and NYCHRL; and

49

Plaintiff's claims under 42 U.S.C. § 1981.  I recommend that the motion to dismiss be GRANTED

with prejudice as to:  Plaintiff's hostile work environment claims under Title VII, the NYSHRL,

and the NYCHRL; Plaintiff's disparate treatment and disparate impact claims based on sexual

orientation under Title VII; and Plaintiff's disparate treatment and disparate impact claims

under the ADA.  I recommend that the motion be DENIED as to Plaintiff's retaliation claims

under Title VII, the NYSHRL, and the NYCHRL.  As to the motion to strike (ECF No. 32), I

recommend granting it in part and denying it in part as set forth above.


Dated: New York, New York
January 20, 2026                                      Respectfully submitted,

                                                     _____
                                                     KATHARINE H. PARKER
                                                     United States Magistrate Judge

**NOTICE**

**Plaintiff shall have seventeen days and Defendants shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).**

**A party may respond to another party's objections after being served with a copy. Fed. R. Civ. P. 72(b)(2). If any party files written objections to this Report and Recommendation, the plaintiff shall have seventeen days to serve and file a response and Defendants shall have fourteen days to serve and file a response. Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Torres.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).**